UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| GEORGE WORRELL, et al, | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 09-4443 |
| v. | : | Opinion |
| ELLIOTT & FRANTZ, et al, | : | |
| Defendants. | : | |

Presently before the Court are cross motions of the parties for summary
judgment.  Plaintiffs George and Mary Worrell ("Plaintiffs") filed a complaint against
Defendant Elliott & Franz under theories of negligence and products liability.[1]  George
Worrell ("Worrell") was injured at work when he attempted to secure a hose on an
excavator that he was responsible for transporting from New Jersey to Pennsylvania.
Worrell was employed by Defendant Winzinger, Inc., which is an excavating company
and named as a defendant for discovery purposes only. Complaint ("Compl.") ¶ 5.
Defendant Elliott & Frantz ("Defendant") services heavy equipment and allegedly
installed certain components on Winzinger's equipment. Id. at ¶¶ 1, 14-15.

Count I of the Complaint seeks liability against Defendant Elliott & Franz under a
theory of products liability. In general terms, Plaintiffs claim that Defendant's improper

---

[1] Defendants Hitachi Construction Machinery (America) Corporation, Hitachi
Construction Machinery Company, Ltd., and Deere-Hitachi Construction Machinery
Company were dismissed with prejudice by way of stipulation on December 17, 2010.
See Dkt. No. 39.

installation of a wet kit onto Winzinger's Hitatchi excavator caused a hose component to protrude above the boom arm in a manner that compromised the ability to safely transport the excavator, rendering it unsafe and defective.  Id., Count I at ¶¶ 1-16. Count II seeks liability under a negligence theory, alleging that Defendant's improper installation of the wet kit is the proximate cause of George Worrell's injuries. Id., Count II at ¶¶ 1-5. Defendant has moved for summary judgment and Plaintiffs cross move for summary judgment barring Plaintiff George Worrells' comparative fault.

## I. Background

A. Facts

George Worrell was responsible for transporting a Hitachi EX450 LC-5 excavator, Winzinger No. 351 (the "excavator") from Voorhees, New Jersey to a job site in Pennsylvania on July 19, 2007.  Ex. A, Compl.; Ex. B, Dep. of George Worrell, 8:11-13, 10:5-16; 14:9-24; 24:3-23; 30:4-32:5; 32:24-33:10.  The parties agree that the excavator had been fitted with a "wet kit" or an auxiliary system subsequent to its original manufacture.  The hoses on the wet kit were installed in a manner that caused them to protrude over the highest or tallest point of the boom arm of the excavator.  The resulting additional height caused by the addition of the hoses presented transportation concerns for Worrell.

For the most part, Worrell transported the excavator for four years without incident.  Ex. B, Dep. of George Worrell 98:15-102:11.  However, on one occasion he transported the excavator on New Jersey State Route 73 and the hoses on the unit rubbed the undercarriage of a bridge.  Id. at 26:8-29:14.  Worrell also had an incident with the excavator while transporting it in Philadelphia, where he failed to clear an

eleven foot overpass.  Id. at 25:1-26:3.  For his July 19, 2007 transport of the excavator, Worrell was planning to travel on State Route 73 in New Jersey. Id. at 20:19-21:4.  Given his previous incident on this road, Worrell felt that he had to secure the hydraulic hoses of the wet kit and he climbed the arm of the boom to reach them.  Id. at 8:11-13, 10:5-16; 14:9-24; 24:3-23; 30:4-32:5; 32:24-33:10.  However, Worrell fell off of the boom arm and was injured.  Ex. D, Dep. of Kenneth Cockerill.

Worrell agrees that he alone decided to attempt to tie down the hydraulic hoses and that no one from Winzinger instructed or required that he do so.  Ex B., Dep. of George Worrell, 28:10-14.  Worrell further agrees that, to his knowledge, he is the only person who secures the hoses or has had a problem transporting the excavator in question.  Id. at 29:9-30:3, 44:19-45:1, see also, Ex D. Cockerill Dep. 43:23-44:2.

B. Worrell's Expert Report

Paul Stephens is Plaintiffs' expert.  He was commissioned to examine the excavator involved in Worrell's injury.  Ex. I, Stephens' Report.  Stephens claims he compared his measurements of the excavator with the State of New Jersey's statutory clearance minimum and the clearance of the anticipated hauling routes and concluded that the height of the excavator, including the installed wet kit, rendered the machine defective.  Id.  Stephens attributes the defect to the improperly installed wet kit, which not only caused regulatory height transportation violations, but also was "an integral part of the 'as manufactured' content of the machine."  Id. at 11.  "[T]he excavator, with an improperly installed wet kit that increased the excavator's transport height and potentially shortened wet kit hose life, had a manufacturing defect."  Id.

Stephens' report, by implicit and explicit means, validates Worrell's

3

transportation clearance concerns.  Id. at 11-12.   It also identifies the theory

underscoring Worrell's products liability claim as a manufacturing defect.

## II. Discussion

### A. Summary Judgement Standard

"Summary judgment is proper if there is no genuine issue of material fact and if,

viewing the facts in the light most favorable to the non-moving party, the moving party

is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d

471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986));

accord Fed. R. Civ. P. 56 (a).  The Court will enter summary judgment in favor of a

movant who shows that it is entitled to judgment as a matter of law, and supports the

showing that there is no genuine dispute as to any material fact by "citing to particular

parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . admissions, interrogatory

answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could

return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a

dispute about the fact might affect the outcome of the suit.  Id.  In determining whether

a genuine issue of material fact exists, the court must view the facts and all reasonable

inferences drawn from those facts in the light most favorable to the nonmoving party.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a

genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once

4

the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  <u>Id.</u>; <u>Maidenbaum v. Bally's Park Place, Inc.</u>, 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  <u>Anderson</u>, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" <u>Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs</u>, 982 F.2d 884, 890 (3d Cir. 1992) (quoting <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

<u>Celotex</u>, 477 U.S. at 322.  That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); <u>accord</u> Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the factfinder.  <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

## B. Analysis

Generally, the parties dispute the Plaintiffs' ability to simultaneously maintain an

action under the PLA and a negligence claim.  Substantively, Defendant disputes that it installed the wet kit on the excavator and disputes the accuracy of Plaintiffs' expert's measurements which form the basis for the expert opinion.  Plaintiffs cross move to bar comparative fault.

### 1. Whether Elliott & Frantz Installed the Wet Kit on the Excavator

There is a genuine issue of fact as to whether or not Defendant Elliott & Frantz installed the wet kit on the excavator.  There is no documentation proving that Elliot & Frantz, or someone else, installed the wet kit.  Robert Winzinger suggested that his company did not keep very good records and often  resolved outstanding bills in lump sums without accounting for particular invoices. See Dep. of Robert Winzinger, 150:1-151:14.  Likewise, no one from Elliott & Frantz recalls installing the wet kit on the excavator. See Dep. of Bill McLoughlin, 6:13-21; 18:1-7; Dep. of Scott Szyplowski, 19:21-25; 7:10-18; 26:15-20, 29:9-13, 32:21-25.  The absence of documentation would normally support Defendant's claim that they did not perform the installation.

However, the record demonstrates that Winzinger never installed wet kits on its machines because no one at Winzinger possessed the skill to perform the installation. See Dep. of Robert Winzinger, 116:23-118:4 and 118:13-17; 114:1-7; Dep. of Robert Hahn, Jr., 55:12-24; 61:14-20; 63:12-15.  The Head Mechanic for Elliott & Frantz stated that he has installed approximately fourteen wet kits on Hitachi excavators over the course of his employment, but that he does not have any recollection of installing the wet kit on the excavator.  See Dep. of Scott Szyplowski, 19:21-25; 7:10-18; 26:15-20, 29:9-13, 32:21-25.

The absence of any documentation linking either Defendant, or another firm, to the

6

installation of the wet kit, leaves the question of who installed the wet kit open. Given the historical relationship of the parties and the deposition testimony in the record, there is enough to survive summary judgment and present this threshold question to a jury.

        2. Whether Plaintiffs' Expert Report is a Net Opinion

        Before addressing the merits of the summary judgment motions, the admissibility of Plaintiffs' expert report will be considered.  Elliott & Frantz challenge the measurements in the export report as inaccurate because Stephens' measurements were taken when the excavator had additional components parts attached.  Specifically, the "bucket" was attached to the boom during Stephens' measurement, causing a three inch height differential between the excavator as it existed on the day of the accident with a hammer attachment and the excavator that Stephens measured.  Def. Reply Br. at 6.; see also Stephens Dep., Def. Ex. 4, pp. 9-12.  If Defendant is correct, the upshot may be that the excavator did not offend the transportation regulations and was not defective under this theory.  Defendant also moves to strike the expert opinion as an impermissible "net" opinion.

        A net opinion is not a specific factor under Daubert, nor can it be found as a specific rule in the Federal Rules of Evidence. See Holman Enter. v. Fidelity & Guar. Ins. Co., 563 F.Supp.2d 467, 472 n. 12 (D.N.J. 2008). Essentially, it's a longstanding rule that dictates exclusion of expert testimony that contains "bare conclusions, unsupported by factual evidence." Id. (citing Buckelew v. Grossbard, 435 A.2d 1150, 1156 (N.J. 1981)). Expert opinion testimony aids the trier-of-fact in making factual determinations and must be predicated upon evidence, not speculation. See State v. Kelly, 478 A.2d 364, 379

7

(N.J. 1984).  "Such an opinion . . . [is] of no assistance to the trier of fact" and may be insufficient to establish causation.  Tannock v. New Jersey Bell, 537 A.2d 1307, 1309, (N.J. Super. Ct. App. Div. 1988).  Therefore, an expert opinion based upon speculation, possibilities or contingencies is inadmissible.  See Buckelew, 435 A.2d at 1150.

Defendants make a good case for discounting Plaintiffs' expert, especially if the calculations are based upon incorrect measurements.  However, the report is substantiated by the authority relied upon by the expert in rendering his opinion and is not a net opinion.  Defendants are free to challenge the basis for the calculations made by Plaintiffs' expert at trial.  As a result, Defendants' motion to dismiss the expert report is denied.

3. Whether Plaintiffs Can Pursue Their Negligence Action and Their Product's Liability Action

In New Jersey, "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty" are subsumed by the Products Liability Act, N.J. Stat. Ann. § 2A: 58C-1 et seq. ("PLA").  See In re Lead Paint Litigation, 924 A.2d 484, 503 (N.J. 2007) (noting that "the PLA is both expansive and inclusive, encompassing virtually all possible causes of action in relating to harms caused by consumer or other products").  The New Jersey Legislature enacted the PLA to establish clear rules with respect to certain matters relating to actions for damages for harm caused by products.  N.J. Stat. Ann. § 2A:58C-1.  Therefore, if a claim falls within the scope of the PLA, the sole method to prosecute the claim is under the Act.  See Green v. Gen. Motors Corp., 709 A.2d 205, 209 (N.J. Super. Ct. App. Div. 1998)  ("Under the [PLA] . . . the causes of

action for negligence, strict liability and implied warranty have been consolidated into a single product liability cause of action, the essence of which is strict liability.") The PLA provides:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: (a.) deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or (b.) failed to contain adequate warnings or instructions, or (c.) was designed in a defective manner.

N.J. Stat. Ann. § 2A: 58C-2.  Therefore, a plaintiff may assert a strict liability cause of action against a product manufacturer based on an unsafe design defect, manufacturing defect, or failure to warn theory of liability.  Worrell's strict liability claim is predicated upon a theory of manufacturing defect.

To plead a prima facie cause of action under the PLA, a plaintiff must show that the defendant manufactured the product, that a reasonably foreseeable user was injured, that the product was defective, that the defect existed when it left the defendant's control, and that the defect was the actual and proximate cause of the plaintiff's injury. Myrlak v. Port Auth. of N.Y. and N.J., 723 A.2d 45, 52 (N.J. 1999); Zaza v. Marquess & Nell, Inc., 675 A.2d 620, 627 (N.J. 1996); Jurado v. W. Gear Works, 619 A.2d 1312, 1317 (N.J. 1993).

> Under New Jersey law, a "manufacturer" means

> (1) any person who designs, formulates, produces, creates, makes, packages, labels or constructs any product or component of a product; (2) a product seller with respect to a given product to the extent the product seller designs, formulates, produces, creates, makes, packages, labels or constructs the product before its sale; (3) any product seller not described

9

in paragraph (2) which holds itself out as a manufacturer to the user of the product; or (4) a United States domestic sales subsidiary of a foreign manufacturer if the foreign manufacturer has a controlling interest in the domestic sales subsidiary.

N.J. Stat. Ann. § 2A:58C-8.  Elliott and Frantz qualify as a "manufacturer" under the

PLA because they are a product seller.[2]  "A manufacturer has a duty to make sure that its

manufactured products placed into the stream of commerce are suitably safe when used

for their intended or reasonably foreseeable purposes."  Brown v. U.S. Stove Co., 484

A.2d 1234, 1239 (N.J. 1984) (citing Soler v. Castermaster, Div. Of H.P.M. Corp., 484

A.2d 1225, 1229 (N.J. 1984)).  New Jersey courts recognize "normal handling" as a

foreseeable use of a product.  Jurado, 619 A.2d at 1318.  As a result, a manufacturer who

places into the stream of commerce a defective product which causes injury to people

who routinely handle and transport the product may be held strictly liable for that harm.

A product may also be defectively manufactured under the PLA if it "deviated

from the design specifications, formulae, or performance standards of the manufacturer

or from otherwise identical units manufactured to the same manufacturing

specifications or formulae."  N.J. Stat. Ann. § 2A: 58C-2.  "Common examples of

manufacturing defects are products that are physically flawed, damaged, or incorrectly

assembled."  Ebenhoech v. Koppers Industries, Inc., 239 F. Supp. 2d 455, 473 (D.N.J.

2002) (citing Restatement (Third) of Torts § 2 (comment)).  To establish the presence of

---

[2]A "product seller" means any person who, in the course of a business conducted for that purpose: sells; distributes; leases; installs; prepares or assembles a manufacturer's product according to the manufacturer's plan, intention, design, specifications or formulations; blends; packages; labels; markets; repairs; maintains or otherwise is involved in placing a product in the line of commerce.  N.J. Stat. Ann. § 2A:58C−8.

a manufacturing defect, a plaintiff is required to demonstrate, "in a general sense and as understood by a layman, that something was wrong with the product." Id. (citing Scanlon v. Gen'l Motors Corp., 326 A.2d 673, 677 (N.J. 1974) (internal quotation omitted)).

"To determine whether the PLA subsumes a particular claim, courts examine the essential nature of the claim presented and decide whether the claim would traditionally be considered a products claim." Rodnite v. Hovnanian Enters., Inc., No. 08-3787, 2010 WL 3079576, at *3 (D.N.J. Aug. 5, 2010).   This is not to say that the PLA subsumes all causes of action involving a "harm" caused by a "product." New Hope Pipe Liners, LLC v. Composites One, LCC, No. 09-3222, 2009 WL 4282644, at *2 (D.N.J. Nov. 30, 2009). A negligence claim predicating liability on a breach of duty arising independent of the manufacturer's duty to provide a non-defective product would not be considered a product liability action even if the harm was caused by the product.  Likewise, a claim sounding in breach of an express warranty is excluded from the ambit of the PLA, as this cause of action sounds in misrepresentation rather than product liability.

Since the passage of the PLA, New Jersey courts have repeatedly held that claims of negligent manufacture and breach of implied warranty are no longer viable as separate causes of action for harm caused by a product.  See, e.g. Port Auth. of N.Y. & N.J. v. Arcadian Corp., 189 F.3d 305, 313 (3d Cir. 1999) ("Under New Jersey law negligence is no longer viable as a separate claim for harm caused by a product."); Brown ex rel. Estate of Brown v. Philip Morris Inc., 228 F. Supp. 2d 506, 516 (D.N.J. 2002) ("Because the [PLA] generally subsumes common-law product liability claims, the Third Circuit, the New Jersey District Court, and New Jersey State courts

consistently have dismissed product liability claims based on common-law theories when those theories allege harm caused by a product.... In light of the [PLA] and that uniform decisional law interpreting that statutory provision, the Court determines that the [PLA] clearly subsumes plaintiff's common-law claims . . ."); <u>Green</u>, 709 A.2d at 209 ("Under the [PLA] . . . the causes of action for negligence, strict liability and implied warranty have been consolidated into a single product liability cause of action, the essence of which is strict liability."); <u>Tirrell v. Navistar Intern, Inc.</u>, 591 A.2d 643, 647 (N.J. Super. Ct. App. Div. 1991) (noting that "common-law actions for negligence or breach of warranty are subsumed within the new statutory cause of action").

Plaintiffs claim that they can continue to pursue claims under theories of both products liability and negligence at this stage of the litigation.  This case presents a close call.  However, there are sufficient factual disputes that prevent the Court from determining the appropriate cause of action at the summary judgment stage.  There are several cases that inform the Court's decision.

In <u>Ramos v. Silent Hoist and Crane Co.</u>, 607 A.2d 667 (N.J. Sup. Ct. App. Div. 1992), the New Jersey Appellate Division considered whether a defective design product liability action could be brought against the installer for his choice of where to place the controls of the electrical system that powered the capstan. <u>Id.</u> at 669.  In <u>Ramos</u>, defendant installed an electrical system that powered a capstan on a ship.  <u>Id.</u> Importantly, the manufacturer did not include any specifications for the electrical installation.  The court found that defendant "Foremost designed and installed an electrical system to power the capstan.  It may have done so negligently, but it did not . . . provide a defective component part." <u>Id.</u> at 671 (internal citations omitted).

In 1995, the Act was amended to include a broader definition of "product sellers," as set forth above.  The New Jersey Supreme Court has not addressed the viability of Ramos post amendment.  However, two District Courts in this vicinage agree that Ramos remains precedential.  See Ellis v. Siemens Enterprise Network, Inc., 2008 WL 724278 (D.N.J. March 17, 2008) (Simandle, J.); Thomas v. Ford Motor Co., 70 F. Supp. 2d 521 (D.N.J. 1990).

> Regardless of whether the 1995 amendment imposes liability on product sellers or relieves them from liability, the amendment presupposes the existence of a defective product.... While the 1995 amendment brings installers within the ambit of the Product Liability Act in instances where installers trade in defective products, the amendment to the Act was not adopted to bring installers within the coverage of the Act for improperly installing properly-functioning products.

Thomas, 70 F.Supp.2d at 530 (emphasis added).

Here, there does not appear to be any allegation that the component parts of the wet kit are not functional or are themselves defective.  Rather, the addition of an otherwise properly functioning wet kit creates a defective excavator, according to Plaintiffs' expert.  The excavator still can perform its function.  However, according to Plaintiffs, the alleged inability to transport the excavator renders it defective.  In an unpublished decision, a District Court in this vicinage handled a similar issue on a summary judgment motion in Ellis.  2008 WL 724278 (D.N.J. March 17, 2008).

In Ellis, plaintiff, a corrections officer, suffered injury when he responded to a false alarm. He sought relief under theories of negligence and product liability. Id. The District Court granted summary judgment as to the product liability claim which was predicated upon a defective design theory.  Because Plaintiff "did not identify any defects in any component parts supplied or installed by [defendant], arguing instead

13

that the alarm system as a whole was defectively designed[,]" the Court reasoned the claim was not cognizable under the PLA pursuant to Ramos.  2008 WL 724278 at * 7. The Court's holding explicitly applies to manufacturing defects as well. Id. (stating that the expert report failed to "identify a defectively designed or manufactured product[.]"); see also, Ridenour v. Bat Em Out, 309 N.J. Super. 634 (App. Div. 1998) (claims based on improper installation of a product are not cognizable under the PLA); Universal Underwriters Ins. Group v. Public Serv. Elec. & Gas Co., 103 F. Supp. 2d 744 (D.N.J. 2000) (where harm not caused by defective product, action under the PLA dismissed).

Plaintiffs distinguish their claim from Ellis by arguing that the wet kit became an integral part of the as manufactured machine, rendering its installation a manufacturing defect. In addition, Plaintiffs also rely on several cases to support a claim under the PLA. The most useful case is Lee's Hawaiian Islanders, Inc. v. Safety First Prods., 480 A.2d 927 (N.J. Sup. Ct. App. Div. 1984), in which the court, on a summary judgment motion, permitted both strict liability and negligence claims to survive because there were questions of fact related to causation and whether the injury was caused by the installation or a manufacturing defect.  There, a kitchen fire destroyed plaintiff's restaurant.  Defendant Safety installed the fire safety system designed and manufactured by defendant Chemetron Fire Systems. Plaintiff alleged that "the fire suppression system failed to operate properly and therefore failed to extinguish or reasonably contain the fire caused by the igniting oil." Id. at 929.  There was a genuine issue of fact related to whether defendant Safety actually installed a safety nozzle over a fryer. Id.  The failure to install the nozzle would render Saftey liable under a negligent installation theory. Id. at 931-32.  However, if Safety properly installed the nozzle,

14

Plaintiff's claim would be based upon on a design or manufacturing defect. Id.  The dispute as to whether Safety installed the nozzle precluded a determination of Plaintiff's theory of liability and both claims were permitted to proceed.

The factual uncertainty underscoring Lee is also present here.  The kit itself is not defective, and the machine functions properly with the "improperly" installed device.  If the height of the excavator does not offend statutory height restrictions, then the excavator may not be defective.  Or the defect could lie in the failure to install the wet kit in a manner that caused the hoses to run flush against the contours of the boom arm. There is a question as to whether the installation "deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae."  N.J. Stat. Ann. § 2A: 58C-2; see also Ebenhoech , 239 F. Supp. 2d at 473.   If the machine is not defective, then under Ramos and its federal progeny, Plaintiffs' action sounds in negligence, not product liability. see also, Ridenour v. Bat Em Out, 707 A.2d 1093 (N.J. Super. Ct. App. Div. 1998) (claims based on improper installation of a product are not cognizable under the PLA).

On the other hand, if the addition of the wet kit caused the excavator run afoul of transportation regulations or the installation schematics, the Plaintiffs can seek redress under the PLA.  There are genuine issues of fact related to the height of the excavator that prevent the Court from determining the proper cause of action at this time.  As a result, Plaintiffs may proceed under both theories of liability at this time.

4.  Defendant's Summary Judgment Motion

Next, the Court must consider whether summary judgment is warranted on the

merits of Plaintiffs' claims.  Defendant contends that even if it installed the wet kit, there is no genuine issue of fact related to the cause of Plaintiff's injuries.  The standard for a claim predicated upon a defective product is set forth, <u>infra</u>, in the discussion that permits Plaintiffs' claims of product liability and negligence to proceed.  The Court has already determined that there are questions of fact related to whether the excavator is defective.  The Court will consider whether summary judgment is warranted on the issue of proximate cause under the product liability claim simultaneously with Plaintiffs' negligence claim.

To succeed on a claim of negligent installation, Plaintiffs must prove that the Defendant owed a duty of care, breached that duty, and that the breach was the proximate cause of Plaintiffs' actual damages.  <u>Weinberg v. Dinger</u>, 524 A.2d 366, 374 (N.J. 1987).  In New Jersey, the existence of a duty of care is a question of law. <u>Anderson v. Redd</u>, 650 A.2d 376, 379 (N.J. Super. Ct. App. Div. 1994). In determining whether a duty of care existed, the court must balance fairness and foreseeability. <u>Yetter v. Rajeski</u>, 364 F. Supp. 105, 108 (D.N.J. 1978); <u>Goldberg v. Housing Auth. of Newark</u>, 186 A.2d 291, 293  (N.J. 1962). Additional factors such as the relationship between the parties, the nature of the risk, and the public interest in the proposed solution inform the Court's decision. <u>Id.</u>; <u>see</u> <u>Essex v. New Jersey Bell Telephone Co.</u>, 399 A.2d 300, 302 (N.J. Super. Ct. App. Div. 1979).

Here, Defendant had a duty to properly install the wet kit so as to avoid injury to any potential user, including those responsible for transporting the unit.  There is no question that the installation was done either poorly or incorrectly.  There is a question of fact as to whether Defendant breached its duty.  Thus, the only issue that remains is

16

proximate cause.  There is a question as to whether Plaintiff's own negligence caused his injuries.  The dispute lies within the tension between Defendants' acknowledgment that the sloppy installation of the wet kit may present transportation concerns and Plaintiff George Worrell's decision to secure the hoses by climbing the boom arm.  At this juncture, the Court is unable to determine whether the alleged defect or improper installation of the wet kit was a substantial factor in causing Worrell's injuries or whether Worrell's own actions destroyed the causal connection between the alleged defect and his injuries.  As a result, summary judgment is denied as to both the negligent installation claim and the product liability claim.

### 5. Plaintiffs' Comparative Negligence Claim

Plaintiffs claim that they are entitled to summary judgment because New Jersey bars comparative negligence claims in the workplace.  According to Plaintiffs, because Worrell was "engaged at his assigned task on a plant machine . . . he has no meaningful choice.  Irrespective of the rationale that the employee may unreasonably and voluntarily encountered a known risk, the court held as a matter of policy that such an employee is not guilty of contributory negligence." Plaintiffs' Br. at 25 (quoting Suter v. San Angelo Foundry & Mach. Co., 406 A.2d 143-44 (N.J. 1979)).

Plaintiffs are correct that there is no comparative fault under the Products Liability Act.  Johansen v. Makita U.S.A., 607 A.2d 641, 642 (N.J. 1992).  However, Defendant may argue that Worrell's actions were the *sole* cause of his injuries without running afoul of the comparative negligence ban.  See Conguisti v. Ingersoll-Rand, 703 A.2d 340 (App. Div. 1997) (defendant can still attack proximate cause, but the court should issue an instruction limiting the evidence of fault to that issue alone); see also

17

<u>Fabian v. Minster Mach. Co.</u>, 609 A.2d 487, 490-91 (N.J. Super. Ct. App. Div. 1992) (same).  Therefore, Plaintiffs' cross motion is granted in part.

III. Conclusion

As discussed above, Defendant's motion for summary judgment is denied. Plaintiff may pursue both claims of negligence and product liability at trial, but may only recover under one of these theories.  In addition, Plaintiffs' expert report is admissible. Finally, Plaintiffs' cross motion to bar comparative negligence is granted as to the product liability claim.

An appropriate Order shall issue.

DATED: June 28, 2011

/s/ Joseph H. Rodriguez
Hon. Joseph H. Rodriguez,
UNITED STATES DISTRICT JUDGE